**Beth M. BRANUM, Appellant**

v.

**The STATE of Texas, State**

**NO. 02–16–00285–CR**

Court of Appeals of Texas,
Fort Worth.

DELIVERED: November 22, 2017

ATTORNEYS FOR STATE: SHAREN WILSON, CRIMINAL DISTRICT ATTORNEY; DEBRA WINDSOR, CHIEF OF POST CONVICTION; EDWARD L. WILKINSON, KACEY FICKES, ASSISTANT CRIMINAL DISTRICT ATTORNEYS FOR TARRANT COUNTY FORT WORTH, TEXAS.

PANEL: SUDDERTH, C.J.; GABRIEL and KERR, JJ.

## OPINION

LEE GABRIEL, JUSTICE

Appellant Beth M. Branum appeals from her conviction for intoxication manslaughter and twenty-year sentence. She argues that the trial court erred by denying her discovery requests, allowing testimony from an expert whom the State did not timely designate, admitting the results of her diagnostic, blood-serum test, and failing to incorporate the concurrent-cause instruction into the jury charge's application paragraph for the offense. She asserts that each of these alleged errors mandates reversal of her conviction and a remand to the trial court for a new trial. Because we find no reversible error, we affirm the trial court's judgment.

## I. BACKGROUND

### A. FACTS LEADING TO INDICTMENT

On March 8, 2014, Branum met several friends at a bar in Fort Worth. She arrived at 9:35 p.m., met her friend Jacquelyn Seltzer at the bar, and they each had a shot[1] and a beer before going to the table where the others were sitting. Within the next two hours, Branum bought four shots and four beers while at the table. Other people at Branum's table also ordered

ATTORNEY FOR APPELLANT: (MR.) LEIGH W. DAVIS, BEDFORD, TEXAS.

1. The shots consisted of whiskey, peach schnapps, and cranberry juice.

drinks for each other throughout the evening. Branum closed her tab at 12:16 a.m. on March 9, 2014. Seltzer and her boyfriend, who was Seltzer's designated driver, offered to take Branum home once the gathering began to break up because Branum had been drinking. But while Seltzer was closing her tab at the bar, Branum left without saying goodbye.

At 1:00 a.m., Branum called her ex-boyfriend, Yuri Tulchin, and asked if he would pick her up at the bar. She was intoxicated, was scared, and could not find her purse. Tulchin explained that he also had been drinking that night and suggested that Branum call a cab to take her to a hotel. The call was disconnected, and Branum began repeatedly texting Tulchin for the next two hours. The texts were mostly two- to three-word pleas for help, several of which contained nonsensical words such as "Usurp p" and "Yudizp." Branum's texts stopped at 3:14 a.m. after Tulchin texted: "[W]hat a mess. Did you get the hotel room?" It appears that Branum's phone was "broken and inoperable" as of approximately 4:00 a.m.

At 5:00 a.m. on March 9, 2014, Rebecca Thompson was driving to work, approaching an intersection, when she saw a two-car accident and a woman standing in the street waving her arms to get Thompson's attention. When she stopped and got out of her car, Thompson noticed that the woman—Branum—had a swollen ankle. When Thompson approached the other car, she immediately recognized that the driver—Brandon Bennett—was dead.[2] Branum reached in and "rubbed his chest and kind of shook him to get him to wake up" to no avail. Thompson called 911. While they waited for police, Branum told Thompson that the accident happened after she had

"escaped" from a gas station where an attendant "was trying to make her stay," fled to her car, and "just started driving." There was no gas station in the surrounding area.

The responding police officer, Lynette Gilliam, arrived at the scene at approximately 5:13 a.m. Branum told Gilliam that she had been at a bar the night before where she had two shots, that she had left the bar in a cab, and that she had been driving the car that hit Bennett. She elaborated to Gilliam that the cab driver had driven her around randomly and would not let her out of his cab until she paid. After she escaped from the cab, she ran to her car and drove away. Branum related that she stopped at a gas station and that the next thing she remembered was reaching into Bennett's car to check on him.

Gilliam noticed that Branum's eyes were "bloodshot and watery," that her breath "moderate[ly]" smelled of alcohol, and that she spoke slowly. Gilliam began administering field-sobriety tests to Branum. Because of her injured ankle, Branum was unable to perform the walk-and-turn test or the one-leg-stand test. With the horizontal-gaze-nystagmus test, Gilliam noted that Branum's pupils were equally sized and that she could track equally for "one pass" but that she could not concentrate on the stimulus, forcing Gilliam to stop the test before it was complete. After Branum was taken to a hospital, Gilliam obtained a search warrant for a specimen of Branum's blood.

Branum arrived at the hospital at 6:14 a.m. She again reported to a nurse that a cab driver had tried to keep her in his cab until she paid, that she jumped out of the cab once she saw her car, that she drove

---

**2.** Indeed, Bennett had suffered "enormous trauma" to his head and a fracture to the connection between the C–1 and C–2 vertebrae, which severed his spine, spinal cord, and brainstem. He later was pronounced dead at the hospital.

around after no one would help her, and that she was driving fifty miles per hour when she "T-boned another vehicle." She stated that she had consumed two shots and three beers before the accident. The nurse smelled alcohol on Branum and concluded that she was intoxicated. For diagnostic purposes, the attending physician ordered blood samples, which were drawn at 6:50 a.m. These results showed that Branum had 150 milligrams of ethyl alcohol per deciliter. At 7:44 a.m., police officers arrived at the hospital with the search warrant and obtained two samples of Branum's blood. The blood drawn under the warrant was tested six times—one sample was tested four times on two separate days and the other sample was tested two times on one day—and Branum's blood-alcohol concentration at the time of the two draws ranged from 0.0953 to 0.1033 grams of ethanol per deciliter, all above the legal limit.[3] *See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011). The variances between the results from the samples drawn pursuant to the warrant were not scientifically significant.

## B. PRETRIAL

On June 30, 2014, a grand jury indicted Branum with the intoxication manslaughter of Bennett and included an allegation that Branum had used a deadly weapon—a motor vehicle—during the commission of the offense. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2017), § 49.08(a) (West 2011); *see also* Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2017) (explaining effect of deadly-weapon finding on parole eligibility). On May 12, 2015, a grand jury presented a reindictment additionally charging her with manslaughter. *See* Tex. Penal Code Ann. § 19.04(a) (West 2011).

Before trial, Branum repeatedly requested that the State produce Bennett's cell phone for inspection. Branum represented that she sought the contents of the phone to determine whether Bennett had been "distracted" by "text messages, emails that were being sent or read, cell phone calls being received" or whether he was "on the phone" at the time of the accident. The State previously had produced to Branum Bennett's cell-phone records from the time of the crash.[4] The State objected, noting that nothing contained in the phone was relevant, and asked the trial court to review in camera the evidence the State had regarding Bennett's phone to determine if any further information should be produced to Branum.[5] Apparently, the trial court held two hearings in 2015, the first of which occurred in May and the second of which occurred in the trial court's chambers, to determine the merits of Branum's motions for produc-

---

3. The "official finding" of Branum's blood-alcohol concentration by the toxicology lab was 0.099. This concentration was stated in terms of whole blood.

4. Branum represented in a May 2015 pretrial motion that the data produced by the State was "only a list of phone numbers and text data with no message allegedly being from [Bennett's] cellphone." She complained that the produced information was insufficient because it contained "no **emails, SMS messages, voicemails, location information of the cellphone in longitude and latitude, mobility usage provider with cellphone location, and the service provider name**." She argued that not only would this information reveal whether Bennett was distracted but also where he was and how fast he was travelling at the time of the accident.

5. The evidence consisted of three exhibits that the State produced to the trial court: the phone's "complete contents" on a "CD or DVD," an "extraction report" from the State's forensic analyst, and the cell-phone records from Bennett's service provider. These exhibits are not part of the appellate record.

tion.[6] At the hearing that occurred in chambers, the trial court ruled that the records regarding the phone's contents, which he had reviewed in camera, did not contain relevant evidence. The State then requested that the trial court conduct a third hearing to put its ruling "onto the record." The trial court held that hearing on December 10, 2015, both the State and Branum stated their arguments for the record, and the trial court formally denied Branum's motions because the evidence previously reviewed in camera disclosed nothing "relevant or material."

Also before trial, the State designated its expert witnesses, including Dr. Tasha Greenberg, to testify on behalf of the Tarrant County Medical Examiner's Office (the MEO). On June 16, 2016—eleven days before Branum's trial began [7]—the State supplemented its expert-witness disclosure to designate Dr. Nizam Peerwani, the Tarrant County Medical Examiner, as an expert witness. Before the State called Peerwani as a witness during the trial, Branum objected, arguing that the State's designation was untimely. The State explained that it had previously designated Greenberg because she was the medical examiner who had performed Bennett's autopsy but that she was unavailable for trial, which she did not disclose to the State until June 16, 2016. The trial court implicitly overruled Branum's objection and allowed Peerwani to testify.

### C. TRIAL

On the first day of Branum's trial, the State called as a witness the manager of the bar where Branum and her friends had been drinking, Jay Brechot. He testified that after Bennett's death, an agent with the Texas Alcoholic and Beverage Commission (the TABC) contacted the bar to investigate the bar's conduct leading to the accident. Outside the presence of the jury, Brechot elaborated that he had given a statement to the TABC, which he "believe[d]" had been recorded. Branum requested that the trial court either compel the State to produce the statement or strike Brechot's testimony, both of which the trial court denied:

[Counsel for Branum]: We ask for those statements, Judge. The State has to produce.

THE COURT: Are those statements in possession of the district attorney's office?

[The prosecutor]: No, they're not.

THE COURT: Okay. All right.

[Counsel for Branum]: Agent of the State, Judge.

THE COURT: Well, you can subpoena them.

[The prosecutor]: Your Honor, [Branum's counsel has] been aware. He's had since this case started—to contact any witness he wanted, to get any records he want[ed]. We have not inquired as to the civil suit and the civil litigation.[8] I don't ... have it. He has everything I have.

THE COURT: Okay. Excuse me.

[Counsel for Branum]: you can subpoena the witness [i.e., the TABC agent

---

**6.** As Branum notes, there are no docket entries or certificates of proceedings for the May 2015 hearing or the in-chambers hearing. Branum does not argue on appeal that she was harmed by their absence. Indeed, Branum had the opportunity to make each of her arguments regarding production of the cell phone on the record at a third hearing held on December 10, 2015.

**7.** On December 15, 2015, Branum's first trial ended in a mistrial based on a "JUROR CONFLICT."

**8.** Apparently, Bennett's family filed a civil suit against the bar.

who took Brechot's statement] if you'd like to.

. . . .

[Counsel for Branum]: ... But at this time, I'm asking that the testimony of this witness—because the statements have not been provided me, that I'm asking that his testimony be stricken and that the jury be instructed not to consider any of his statements in this case.

THE COURT: Okay. I'll deny that request.

The State also offered into evidence Branum's blood-serum levels, which were included in her hospital medical records and which the State had disclosed to Branum pretrial. Branum objected to the admission of the blood-serum results on the basis that they were not reliable because the State failed to adduce evidence that the testing machine was functioning properly at the time the blood-serum test was conducted.[9] The trial court overruled Branum's objection, noting that the objection went "to the weight and not to the admissibility," and allowed admission of the medical records. The chief toxicologist for the MEO, Dr. Robert Johnson, later testified that Branum's blood-serum level was 150 and that he was familiar with the instrument used to test blood at the hospital where Branum was treated. He explained that by using a conversion formula for serum-blood tests, Branum's blood-alcohol content would have been 0.13 at the time the diagnostic samples were taken.

The jury heard testimony establishing that Branum ran a red light and ran into the side of Bennett's car as Bennett was proceeding through the intersection on a green light. According to the airbag-control module in Branum's car, she was travelling at between 59 to 63 miles per hour in a 35-mile-per-hour zone. An accident-reconstruction investigation showed that Branum's speed was between 59 to 61 miles per hour "at impact" and that Bennett was travelling at "anywhere between .... 30 to 31 miles per hour." Branum braked to avoid the accident but only "a half second before impact." But based on the "lack of skid marks," neither Bennett nor Branum "recognize[d] the danger" in enough time to avoid it.

After testimony concluded, Branum objected to the court's jury charge on the basis that it failed to correctly apply the law of concurrent causation to the charged offenses. Specifically, Branum complained that the application paragraph allowing the jury to find her guilty of intoxication manslaughter was placed before the paragraph allowing the jury to find her not guilty based on concurrent causation. The trial court overruled the objection. The jury found Branum guilty of intoxication manslaughter and manslaughter and found that she had used a deadly weapon in the commission of the offenses.[10] *See* Tex.

9. Branum also objected to the admission of the medical records as a whole because they violated her confrontation rights, and the trial court gave Branum a running objection on this basis. Branum does not argue on appeal that the admission of these records was in error.

10. When the trial court orally read the jury's verdict regarding Branum's guilt or innocence, it only read the guilty verdict as to intoxication manslaughter. The punishment hearing did not address and the trial court did not enter judgment on the manslaughter verdict. But a separate sentence for manslaughter was not authorized under these facts; thus, the trial court did not err by failing to charge the jury at punishment on manslaughter or by failing to enter a sentence on that count, which was merely a lesser-included offense of intoxication manslaughter. *See Bigon v. State*, 252 S.W.3d 360, 369–72 (Tex. Crim. App. 2008); *Ochoa v. State*, 982 S.W.2d 904, 908 (Tex. Crim. App. 1998).

Code Crim. Proc. Ann. art. 37.07, § 1(c) (West Supp. 2017). After a punishment hearing as to intoxication manslaughter, the jury assessed her sentence at twenty years' confinement—the maximum term available—and a $5,000 fine. *See* Tex. Penal Code Ann. § 12.33 (West 2011). The trial court entered judgment on the jury's verdict regarding intoxication manslaughter with a vehicle, including the deadly-weapon finding, and imposed a twenty-year sentence with a $5,000 fine.

### D. APPEAL

Branum now appeals and in four issues argues that the trial court erred by (1) not ordering the State to produce Bennett's cell phone; (2) failing to order the State to produce Brechot's statement to the TABC; (3) admitting the blood-serum results, which she asserts were unreliable; (4) allowing Peerwani to testify even though he had been untimely designated; and (5) overruling her objection to the jury charge.

## II. REQUIRED PRODUCTION UNDER ARTICLE 39.14

In her first issue, Branum argues that the trial court erred by not requiring the State to produce Bennett's cell phone and Brechot's statement to the TABC. She relies on article 39.14(a) and asserts that because the State willfully refused to produce the cell phone or Brechot's statement, she is entitled to a new trial. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a) (West Supp. 2017). Article 39.14(a) imposes a duty on the State, upon a timely request, to produce "material" evidence to the defense if that evidence is "in the possession, custody, or control of the state or any person under contract with the state." *Id.*; *see Ehrke v. State*, 459 S.W.3d 606, 611 (Tex. Crim. App. 2015) (recognizing timely request triggers absolute right to produc-

tion of material evidence). She further asserts in her fourth issue that she is entitled to a new trial because the State failed to designate Peerwani as an expert witness twenty days before trial as mandated by article 39.14(b). *See* Tex. Code Crim. Proc. Ann. art. 39.14(b).

Article 39.14 is a comprehensive discovery statute that provides limited authorization for a trial court to order discovery, and a trial court abuses its discretion by ordering discovery outside its confines. *See In re State ex rel. Warren*, No. 02-17-00244-CV, 2017 WL 3404989, at *1–2 (Tex. App.—Fort Worth Aug. 9, 2017, orig. proceeding) (mem. op.). Thus, we review a trial court's rulings regarding pretrial discovery for an abuse of discretion. *See Tope v. State*, 429 S.W.3d 75, 82 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (article 39.14(a)); *August v. State*, No. 2-04-117-CR, 2005 WL 1477783, at *7 (Tex. App.—Fort Worth June 23, 2005, pet. ref'd) (mem. op., not designated for publication) (article 39.14(b)).

### A. BENNETT'S CELL PHONE

Regarding Bennett's phone, Branum asserts that the trial court stepped into the shoes of an expert and erroneously applied a relevance "screening" before ordering production. But article 39.14(a) requires the State to produce evidence in its possession only if that evidence is "material to any matter involved in the action." Tex. Code Crim. Proc. Ann. art. 39.14(a). The evidence that the trial court reviewed in camera and the records the State provided to Branum pretrial revealed that at the time of the accident, which was the "matter involved in the action," Bennett's phone was not in use. To establish that requested evidence is material, a defendant must provide more than a possibility that it would help the defense or affect the trial. *See In re Hawk*, No. 05-16-00462-CV,

2016 WL 3085673, at *2 (Tex. App.—Dallas May 31, 2016, orig. proceeding) (mem. op.). Evidence must be "indispensable to the State's case" or must provide a reasonable probability that its production would result in a different outcome to be considered material and subject to mandatory disclosure under article 39.14(a). *Id.*; *see Ehrke*, 459 S.W.3d at 611.

Branum's theory of materiality for production of the phone was that it would be material to whether Bennett was distracted at the time of the accident:

> Obviously, part of a defense would be: Was [Bennett] distracted with the cell phone? Were there any text messages, e-mails that were being sent or read, cell phone calls being received, or that he was on the phone, YouTube, weather apps, photos, calendars, iBooks, Face-Time, Twitter, iTunes, or any equivalent of that on his phone, any Internet search being conducted at the time, and even FaceBook?

Branum further asserted in pretrial motions that the phone would show where Bennett was at the time of the accident and how fast he was going, which she asserted were both "relevant and material issues in [the] case." The trial court found that the evidence did not do so and was not material to a matter at issue; therefore, the phone was not subject to mandatory disclosure under article 39.14(a). Branum's assertion at oral argument that the phone "could have" revealed significant data is nothing more than a mere possibility, which is insufficient for purposes of mandatory disclosure under article 39.14(a). *See United States v. Agurs*, 427

U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

Branum did not dispute that she received Bennett's cell-phone records from the time of the accident or that she was given an opportunity at the May 2015 hearing to question the State's expert regarding the cell phone and the evidence the court reviewed in camera. Further, when asked whether the speed of a car could be calculated based on a cell phone's GPS location, the State's accident reconstructionist testified that he had "never done that or heard of that being done in this kind of setting." Branum failed to meet her burden to show that the records were essential or material to a matter involved in the case, and the trial court did not abuse its discretion by denying her request. *See generally Ehrke*, 459 S.W.3d at 611 (recognizing defendant bears burden to show evidence is subject to production under article 39.14(a)). We overrule this portion of issue one.

### B. BRECHOT'S STATEMENT TO THE TABC

■ Branum also argues that the trial court abused its discretion by failing to order the State to produce Brechot's statement to the TABC.[11] As we stated above, to be subject to disclosure under article 39.14(a), the requested, material evidence must be in the "possession, custody, or control of the state or any person under contract with the state." *See* Tex. Code Crim. Proc. Ann. art. 39.14(a).[12] Even as-

---

11. On appeal, Branum does not additionally assert as she did at trial that the trial court should have struck Brechot's testimony in its entirety.

12. We note that Branum's assertion on appeal that article 39.14(a) does not include a

possession requirement as in article 39.14(h) is incorrect. And article 39.14(a) no longer mandates production if evidence is in the possession, custody, or control of "the State or any of its agencies" as the State and Branum asserted at oral argument. Act of May

suming that Brechot's belief that the TABC recorded his statement mandated production and assuming that the TABC is the equivalent to "the state or any person under contract with the state," Branum cannot show the requisite harm flowing from this assumed error—whether the withheld evidence affected her substantial rights by denying her access to evidence that would have changed the outcome of the trial in her favor. *See* Tex. R. App. P. 44.2(b); *Menefee v. State*, 211 S.W.3d 893, 902 (Tex. App.—Texarkana 2006, pet. ref'd). Here, Seltzer testified to the same facts, without objection, as did Brechot: the time of Branum's arrival at the bar, the approximate number of drinks she and her friends bought, and the time Branum left the bar. Accordingly, Brechot's testimony established nothing more than that established by Seltzer, rendering the nonproduction of Brechot's statement to the TABC, even if recorded, harmless. *Cf. Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991) ("[T]he admission of Johnson's testimony without objection rendered the [erroneous] admission of Bitenc's testimony harmless because it established substantially the same evidence of appellant's character as did the admission of Bitenc's testimony."). We overrule the remaining portion of issue one.

## C. TIMELY DESIGNATION OF TESTIFYING EXPERTS

█ In her fourth issue, Branum argues that the State violated the discovery statute by failing to timely disclose that Peerwani would testify for the State on behalf of the MEO. Indeed, the State supple-

mented its witness disclosure to add Peerwani as an expert witness less than twenty days before the trial began. *See* Act of May 21, 1999, 76th Leg., R.S., ch. 578, § 1, 1999 Tex. Gen. Laws 3118, 3118 (amended 2015) (current version at Tex. Code Crim. Proc. Ann. art. 39.14(b)). Although Branum objected to the late designation before Peerwani testified, the trial court implicitly overruled the objection and allowed him to testify.

█ In considering whether the trial court abused its discretion, we consider any showing of bad faith on the part of the prosecutor in the late designation and whether the defendant could reasonably anticipate that the witness would testify although his name was not previously disclosed. *Nobles v. State*, 843 S.W.2d 503, 514–15 (Tex. Crim. App. 1992). Here, there is no showing that the State failed to disclose Peerwani through bad faith.[13] In fact, just the opposite: the previously designated witness for the MEO could not be present for trial and failed to notify the State until less than twenty days before trial, which the State immediately disclosed to Branum. And Branum could have reasonably anticipated that a representative from the MEO would testify to the causes of Bennett's death in her trial for intoxication manslaughter. *See Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993); *Alexander v. State*, No. 08-14-00113-CR, 2016 WL 4379446, at *5–6 (Tex. App.—El Paso Aug. 17, 2016, no pet.) (not designated for publication); *Gowin v. State*, 760 S.W.2d 672, 674 (Tex. App.—Tyler 1988, no pet.). Additionally, Branum failed to request a continuance based on

---

18, 2009, 81st Leg., R.S., ch. 276, § 2, 2009 Tex. Gen. Laws 732, 733 (amended 2013) (current version at Tex. Code Crim. Proc. Ann. art. 39.14(a)). Article 39.14(a) in effect at the time of the offense, which is its current version, provides for production of evidence that is in the possession, custody, or control

of "any person under contract with the state." Tex. Code Crim. Proc. Ann. art. 39.14(a).

**13.** Branum concedes that "[t]he record is devoid of evidence that the State acted in bad faith."

the late designation, rendering any error on the part of the trial court harmless.[14] *See Barnes v. State*, 876 S.W.2d 316, 328 (Tex. Crim. App. 1994); *Byrd v. State*, No. 02-15-00288-CR, 2017 WL 817147, at *5 (Tex. App.—Fort Worth Mar. 2, 2017, pet. ref'd) (mem. op., not designated for publication). All of these factors lead us to conclude that the trial court did not abuse its discretion by allowing Peerwani to testify over Branum's objection. We overrule issue four.

## III. BLOOD EVIDENCE

▮ In her second issue, Branum argues that the trial court erred by admitting the diagnostic, serum-blood results because the State failed to show that those results were reliable, which was her objection at trial. Specifically, she points to the State's failure to introduce information about the reliability of the serum-testing machine used by the hospital. After Branum's objection and in a hearing outside the presence of the jury, Branum adduced the testimony of a toxicologist, Dr. Thomas Pittman, who testified that serum-blood results should not be admitted because such results do not meet "forensic standards" and because Branum's results did not include "calibration and quality control results" from the hospital. The trial court overruled Branum's objection to the admission of the serum results, stating that her objection "goes to the weight and not to the admissibility," and admitted the entirety of Branum's medical records, including the serum results.

After the trial court's ruling but later in the trial, Johnson testified that he was familiar with the testing machine used by the hospital and that Branum's serum-blood test result was 150, which equated to a whole-blood result of 0.13. Branum did not object to this testimony. The State argues that any error in the admission of the serum test results was "cured" after Johnson's testimony was adduced with no objection. But the trial court overruled Branum's reliability objection and admitted the blood-serum portion of Branum's hospital records outside the presence of the jury. The first testimony as to the serum results was from Johnson. Branum was not required to object again when the evidence was first discussed in the jury's presence. *See, e.g., Coalwell v. State*, No. 04-16-00358-CR, 2017 WL 4014707, at *7 (Tex. App.—San Antonio Sept. 13, 2017, no pet.) (mem. op., not designated for publication); *Perez v. State*, No. 10-16-00029-CR, 2016 WL 7436632, at *2 (Tex. App.—Waco Dec. 21, 2016, pet. ref'd) (mem. op., not designated for publication); *Rawlings v. State*, 874 S.W.2d 740, 742 (Tex. App.—Fort Worth 1994, no pet.).

Although Branum was not required to object again in the jury's presence to preserve this argument for our review, the entirety of the record must show that Branum was harmed by the admission of the serum results. *See Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Error arising from the alleged erroneous admission of the serum results would be harmful if it affected Branum's substantial rights, i.e., the error had a substantial and injurious effect on the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Patterson v. State*, 508 S.W.3d 432, 440 (Tex. App.—Fort Worth 2015, no

14. Branum's appellate counsel admits that this argument "deviates from what much of the case law suggests" regarding the effect of her failure to request a continuance based on the late designation. We find no support for counsel's argument that the burden to request a continuance was on the State or that we should otherwise deviate from settled case law on this issue.

pet.). The entirety of the record here does not show the requisite harm.

Multiple markers of Branum's intoxication apart from the serum results were admitted into evidence. Her blood samples taken pursuant to the search warrant were tested multiple times with no result being below the legal limit for intoxication. Gilliam, the responding police officer, testified that Branum admitted she had been drinking the night before, was unable to complete the horizontal-gaze-nystagmus test, and smelled of alcohol. Branum's treating nurses stated that she smelled of alcohol and concluded that she was intoxicated. Seltzer testified that Branum had multiple drinks the night before the accident. So many, in fact, Seltzer fruitlessly offered to have her boyfriend drive Branum home. We would not be able to conclude that the allegedly erroneous admission of the serum results, which also indicated Branum's intoxication, had a substantial and injurious effect on the jury's verdict in light of this other evidence showing that she was intoxicated. *See, e.g., Leigh v. State*, No. 10-12-00056-CR, 2013 WL 5777852, at *3–4 (Tex. App.—Waco Oct. 24, 2013, no pet.) (mem. op., not designated for publication); *Hartman v. State*, 198 S.W.3d 829, 840 (Tex. App.—Corpus Christi 2006, no pet.). We overrule issue two.

## IV. JURY CHARGE

■ In her third issue, Branum asserts that the jury charge was erroneous because it failed to correctly incorporate the causation instruction.[15] The abstract portion of the charge defined concurrent causation.[16] *See* Tex. Penal Code Ann. § 6.04(a) (West 2011). The charge followed this abstract definition of causation with two application paragraphs regarding intoxication manslaughter: (1) authorizing the jury to find Branum guilty if it found "that the death of Brandon Bennett would not have occurred but for the conduct of [Branum], operating alone or concurrently with another cause" and (2) authorizing the jury to find Branum not guilty if it found that "a concurrent cause . . . was clearly sufficient to produce Brandon Bennett's death and also that the conduct of [Branum] was clearly insufficient to cause the death of Brandon Bennett." Branum objected to the charge, arguing that the jury could find her guilty in the first application paragraph and ignore the second application paragraph, which would result in the jury's failure to fully consider concurrent causation. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). The trial court overruled her objection and later read the entirety of the jury charge to the jury before it began deliberating.

■ The charge as given allowed the jury to find Branum guilty of intoxication manslaughter based on the first application paragraph or not guilty based on the second application paragraph. These application paragraphs, which applied the prior, abstract law of concurrent causation to the facts of the case, were the operative and authorizing paragraphs raising and applying the issue of concurrent causation. *Cf. Saenz v. State*, 474 S.W.3d 47, 51–53 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (finding jury-charge error based on charge's failure to apply included abstract causation definition to the facts of the case in the application paragraph); *Mallard v. State*, 162 S.W.3d 325, 334 (Tex. App.—

---

15. At trial, Branum introduced evidence suggesting that her accelerator pedal had become stuck at the time of the accident and that she had a green light when she crossed into the intersection.

16. Branum does not assert that this definition was erroneous.

Fort Worth 2005, pet. ref'd) ("The absence of an application paragraph incorporating the concept of concurrent causation means that the jury was not authorized to convict on a theory applying concurrent causation."). We may not review these paragraphs in isolation; instead, we are required to view the charge as a whole. *See Ekern v. State*, 150 Tex.Crim. 319, 200 S.W.2d 412, 415 (Tex. Crim. App. 1947) ("The court cannot and is not required to charge all the law in each paragraph of his charge, but such charge should be taken and considered as a whole; and an ordinary jury is expected to and surely does take the charge as a whole and considers it as such."). The jury charge here was not erroneous merely because the second application paragraph did not precede the first application paragraph, neither of which Branum challenges as substantively in error. *See Smith v. State*, No. 2-05-207-CR, 2006 WL 1791681, at *6 (Tex. App.—Fort Worth June 29, 2006, no pet.) (mem. op., not designated for publication); *Wingo v. State*, 143 S.W.3d 178, 190 (Tex. App.—San Antonio 2004), *aff'd on other grounds*, 189 S.W.3d 270 (Tex. Crim. App. 2006); *Alvarado v. State*, 821 S.W.2d 369, 374 (Tex. App.—Corpus Christi 1991, no pet.). And we cannot assume that the jury did not consider the charges in their entirety, which the trial court had read to the jury in toto before deliberations. *Cf. Martin v. State*, 335 S.W.3d 867, 874 (Tex. App.—Austin 2011, pet. ref'd) ("We must assume that the jurors read and understood the charge as a whole...."); *Atkinson v. State*, 107 S.W.3d 856, 859–60 (Tex. App.—Dallas 2003, no pet.) ("Without evidence to the contrary, we may assume the jury was not confused or misled by the charge...."). We overrule issue three.

## V. CONCLUSION

Because no reversible discovery violation occurred, no harm resulted from the admission of the serum-blood results, and the jury charge was not erroneous, we overrule Branum's issues and affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).